UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

MARGARITA ROSSY, *as Administrator of the
Estate of Jose Hernandez-Rossy*,

                              Plaintiff,

        v.                                                    **DECISION AND ORDER**

                                                              17-CV-937S

CITY OF BUFFALO, JUSTIN TEDESCO,
JOSEPH          ACQUINO,          POLICE
COMMISSIONER DANIEL DERENDA, and
AMERICAN MEDICAL RESPONSE,

                              Defendants.


## I.     INTRODUCTION

This is a civil rights and wrongful death action commenced by Plaintiff Margarita
Rossy ("Plaintiff"), the administrator of Jose Hernandez-Rossy's ("Hernandez-Rossy")
estate, for claims arising out of Hernandez-Rossy's injuries and death sustained in a
police-involved shooting.  Plaintiff sues Buffalo Police Officers Justin Tedesco and Joseph
Acquino, the police officers who stopped and shot Hernandez-Rossy; the Police
Commissioner; the City of Buffalo; and American Medical Response ("AMR"), the
ambulance company that treated and transported Hernandez-Rossy following the
shooting.  Plaintiff alleges that excessive force and negligence caused Hernandez-
Rossy's suffering and death.

Before this Court are four motions for summary judgment.  Two of the motions
involve Plaintiff's claims against the City of Buffalo, Officers Acquino and Tedesco, and
Commissioner Derenda (Docket Nos. 103, 107).  Those two motions are considered and
resolved in a separate decision filed contemporaneously herewith (Docket No. 142).

Considered here are the remaining two motions, each of which seeks summary judgment on Plaintiff's Fifth Cause of Action alleging that AMR negligently rendered first aid and medical treatment to Hernandez-Rossy, resulting in his pain and death (Docket Nos. 98[1], 99[2]). This is the only claim against AMR. Plaintiff and AMR each seek summary judgment in their own favor. For the reasons stated below, AMR's motion will be granted in part and denied in part, and Plaintiff's motion will be denied.

## II.    BACKGROUND

On May 7, 2017, Officers Tedesco and Acquino were driving on East Street in the Riverside neighborhood of Buffalo when they observed Hernandez-Rossy also driving there. What subsequently occurred between the officers and Hernandez-Rossy is hotly contested, but there is no dispute that Officer Acquino physically engaged with Hernandez-Rossy and subsequently suffered an injury to his right ear from what he believed to be a gunshot, and that Officer Tedesco thereafter shot Hernandez-Rossy in the vicinity of Garfield Street and Hartman Place. Hernandez-Rossy then fled on foot before being apprehended a few blocks away at 568 Tonawanda Street. It is further undisputed that AMR was dispatched to the scene to provide emergency medical services and hospital transport after multiple 911 calls reported the incident.[3]

---

[1]In support of its motion, AMR submitted a Statement of Undisputed Facts (Docket No. 98-2); an Attorney's Affirmation, with exhibits (including video) (Docket No. 98-3); a memorandum of law (Docket No. 98-1), a reply memorandum of law (Docket No. 130); and additional evidence (Docket No. 134-2). In opposition, Plaintiff submitted a response to AMR's Statement of Undisputed Facts (Docket No. 116); a memorandum of law (Docket No. 117); and manually filed exhibits (Docket Nos. 127, 128).

[2]In support of her motion, Plaintiff submitted a Statement of Undisputed Facts (Docket No. 100); a memorandum of law (Docket No. 101); an Attorney's Declaration, with exhibits (Docket No. 102); and a reply memorandum of law (Docket No. 133). In opposition, AMR submitted a response to Plaintiff's Statement of Undisputed (Docket No. 115-1), a memorandum of law (Docket No. 115); and an Attorney's Affirmation (Docket No. 114).

[3] AMR contracted with the City of Buffalo to provide emergency medical services in Buffalo (Compl., ¶ 12).

2

Plaintiff alleges that AMR was negligent in providing emergency medical care and hospital transport, ultimately resulting in Hernandez-Rossy's death (Complaint ("Compl."), Docket No. 1, ¶¶ 1, 2, 12, 39-41).  Plaintiff's Fifth Cause of Action, the only cause of action at issue here, alleges a New York common law wrongful death claim against AMR, the City, and Officers Tedesco and Acquino (id. ¶¶ 40-41).

Each side submitted a Statement of Facts and objections to their opponent's Statement of Facts (Docket Nos. 98-2, 100, 115-1, 116).  The documents contain widely disparate versions of the facts and characterizations of the allegations.  Pursuant to Local Civil Rule 56 (a)(1) and (2), this Court accepts the few facts agreed upon by the parties, while noting material disagreements.

**A.  AMR's Dispatch**

Part of Plaintiff's claim is that AMR's response time was negligent.  This places at issue the chronology of events leading to AMR's arrival, the timing of emergency treatment, and the transport time from the scene to the hospital.  The parties dispute much of the evidence from which the chronology is taken, including surveillance video time logs, 911 call logs, and AMR's internal reports (Supporting Declaration of Nelson S. Torre, Esq. ("Pl. Atty. Decl."), Docket No. 102, Exs. 2, 6, 7, 9-17;  Plaintiff's Statement of Undisputed Material Facts ("Pl. Statement"), Docket No. 100, ¶¶ 3-4, 19; Attorney Affirmation ("AMR Atty. Affirm."), Docket No. 98-3, Exs. G, I).

According to Plaintiff, Officer Tedesco shot Hernandez-Rossy at approximately 5:12 p.m., after which Hernandez-Rossy ran two blocks to 568 Tonawanda Street, where he collapsed in the driveway (Pl. Statement ¶¶ 1-2, 5).  A 911 caller reported that

Hernandez-Rossy was "bleeding out" in her neighbor's driveway on Tonawanda Street, at 5:16 p.m. (id. ¶ 5).

Surveillance video footage from 564 Tonawanda Street (the neighboring house) shows that the first police officers arrived at 568 Tonawanda Street at 5:23 p.m. (id. ¶ 9). Buffalo Police Officer Richard Hy arrived at the scene at 5:24 p.m. and observed Hernandez-Rossy's condition (id. ¶¶ 11, 12). Officer Hy recounted that Hernandez-Rossy was conscious and alert and speaking to officers as he was searched and checked for injuries (id. ¶ 12). Officer Hy further recounted that Hernandez-Rossy was repeatedly complaining that his chest hurt and that he could not breathe (id.).

Hernandez-Rossy was breathing heavily but was awake, moving, and conversant when Buffalo firefighters arrived to render additional first aid at 5:28 p.m. (id. ¶ 13; Pl. Atty. Decl., Ex. 32, pp. 76-77). About one minute later, Hernandez-Rossy lost consciousness and "went limp" (Pl. Statement, ¶ 14; Pl. Atty. Decl., Ex. 33, p. 26).

Plaintiff maintains that AMR's first ambulance arrived in front of 568 Tonawanda Street at 5:29 p.m., just before Hernandez-Rossy went limp (Pl. Statement, ¶ 15). The EMT's did not approach Hernandez-Rossy in the driveway, however, because police officers redirected the ambulance to treat Officer Acquino back on Garfield Street (id. ¶¶ 15-16, 17). AMR denies this, concluding that Plaintiff is speculating about what occurred from viewing a surveillance video (Response to Statement of Undisputed Facts ("AMR Response"), Docket No. 115-1, ¶ 17).

A second AMR ambulance arrived in front of 568 Tonawanda Street at 5:32 p.m., with the paramedics immediately entering the driveway to begin rendering medical care to Hernandez-Rossy (Pl. Statement, ¶ 18). Eight minutes later, the paramedics loaded

Hernandez-Rossy onto a stretcher and placed him in the ambulance (id. ¶ 19).  The ambulance departed for Kenmore Mercy Hospital at 5:46 p.m. (id. ¶¶ 19, 20; Pl. Atty. Decl. Ex. 21).

The parties dispute the relevant 911 calls that led to Hernandez-Rossy receiving emergency treatment from AMR (compare Pl. Statement ¶¶ 3-4 with AMR Response, ¶¶ 3-4).  Plaintiff relies on 911 calls at 5:13 p.m. that reported shots fired and alerted authorities that emergency medical response was necessary (Pl. Statement ¶¶ 3-4; Pl. Atty. Decl., Ex. 2, p. 5).

AMR maintains that the 5:13 p.m. calls related to Officer Acquino's need for assistance, not Hernandez-Rossy's.  It contends that the Erie County Central Police Services ("CPS") 911 call log reflects that the 5:13 p.m. calls reported shots fired on Garfield Street and Hartman Place, resulting in the dispatch of an ambulance for Officer Acquino (AMR Atty. Affirm., Ex. G, p. 1 and Ex. K; Pl. Atty. Decl. Ex. 2; AMR Response ¶ 3; Plaintiff's Response to AMR's Statement of Undisputed Facts, ("Pl. Response"), Docket No. 116, ¶ 24).  According to AMR, the 911 call prompting the dispatch for Hernandez-Rossy was not made until 5:17 p.m., after officers apprehended Hernandez-Rossy at 568 Tonawanda Street (AMR Response, ¶¶ 2, 3, 4.)  It is undisputed that officers reported to the dispatcher that Hernandez-Rossy was in custody as of 5:19 p.m. and was injured and waiting for an ambulance (AMR Statement of Uncontested Material Facts ("AMR Statement"), Docket No. 98, ¶¶ 22, 23; AMR Atty. Affirm., Ex. G, p. 2; Pl. Response ¶ 22).

According to AMR's Pre-Hospital Patient Care Report ("PCR") for Hernandez-Rossy, AMR received the call that an ambulance was needed at Tonawanda Street at 5:17 p.m. (AMR Atty. Affirm. Ex. I, p.1; AMR Statement ¶ 24).   The second AMR

ambulance was dispatched from its headquarters on the William L. Gaiter Parkway in Buffalo at 5:18 p.m., arriving at the scene at 5:25 p.m., with paramedics at Hernandez-Rossy's side one minute later (AMR Atty. Affirm. Ex. I, p. 1; AMR Statement, ¶¶ 26, 30). Plaintiff disputes the accuracy of the times indicated in the PCR, arguing that an ambulance could not travel from AMR's headquarters to 568 Tonawanda Street through rush hour traffic at regulated emergency speeds and arrive at the time AMR claims it did (Pl. Response, ¶¶ 26, 31).

### B. Hernandez-Rossy's Medical Treatment at the Scene

AMR paramedic Christopher Bosley arrived at 568 Tonawanda Street in the second ambulance at 5:25 p.m. and immediately went to Hernandez-Rossy's side (AMR Statement ¶ 31; AMR Atty. Affirm. Ex. I, pp. 1, 6).   Hernandez-Rossy was prone, handcuffed, unconscious, and unresponsive (AMR Statement, ¶¶ 42, 43; AMR Atty. Affirm., Ex. I, p. 1; Pl. Response, ¶ 42).   He was gasping for air, and the quality of his breath was reportedly not sufficient to sustain life (AMR Statement, ¶¶ 45, 46).

The first responders who had been providing treatment told Bosley that Hernandez-Rossy had a gunshot wound to his upper left arm, where a police officer had previously applied a tourniquet (AMR Statement, ¶¶ 32-34, 39, 40).   Bosley took Hernandez-Rossy's vital signs at 5:27 p.m., as firefighters administered oxygen at 5:28 p.m. (AMR Atty. Affirm., Ex. I, p. 3).   AMR personnel performed CPR and began a cardiac monitor (AMR Statement, ¶¶ 47-48; AMR Atty. Affirm., Ex. I, p. 4).   They then introduced a king airway and intraosseous vascular access at 5:35 p.m., in place of an IV (AMR Statement, ¶¶ 49, 50; AMR Atty. Affirm., Ex. I, p. 4).   AMR states that its ambulance team spent about four minutes treating Hernandez-Rossy, but he never regained

consciousness (AMR Statement, ¶¶ 51, 52).  Plaintiff disputes the duration of the treatment AMR paramedics provided (Pl. Response, ¶¶ 50, 51).

### C.  Hernandez-Rossy's Transport to the Hospital

AMR maintains that the ambulance carrying Hernandez-Rossy left Tonawanda Street at 5:43 p.m. and arrived at Kenmore Mercy Hospital at 5:47 p.m., with transfer of care to the hospital completed at 5:50 p.m. (AMR Atty. Affirm., Ex. I, p. 1; AMR Statement ¶¶ 56, 57).  AMR took Hernandez-Rossy to Kenmore Mercy, rather than to the Erie County Medical Center ("ECMC"), because Kenmore Mercy was closer (AMR Statement, ¶ 54).  With Hernandez-Rossy in cardiac arrest, AMR personnel concluded that transporting him to the nearest hospital was best (id. ¶ 55).  AMR paramedics told the hospital staff that Hernandez-Rossy had been found on the ground unresponsive and had no palpable pulse despite receiving 15 minutes of CPR prior to arrival (id. ¶¶ 58, 59, Pl. Response, ¶¶ 58, 59).  Hernandez-Rossy was pronounced dead in Kenmore Mercy's emergency room at 5:53 p.m. (Pl. Atty. Decl., ¶ 21, Ex. 36).

Plaintiff disputes AMR's hospital-transport timeline (Pl. Statement, ¶¶ 56, 57).  She maintains that surveillance video shows the ambulance leaving Tonawanda Street at 5:46 p.m., and that it is impossible that it could have arrived at Kenmore Mercy one minute later (Pl. Response, ¶ 57.)  Plaintiff also points to Kenmore Mercy's nursing notes, which indicate that the ambulance arrived at 5:50 p.m., not 5:47 p.m. (Pl. Response, ¶¶ 56, 57; Pl. Atty. Decl., Ex. 5).

### D.  The Decision to Transport Hernandez-Rossy to Kenmore Mercy Hospital

Another part of Plaintiff's claim is that AMR acted negligently by taking Hernandez-Rossy Kenmore Mercy Hospital, rather than ECMC.  According to Plaintiff's expert, Adin

Bradley, Kenmore Mercy was unsuitable because it is not a Level I trauma center like ECMC (Pl. Statement, ¶¶ 54, 55; Pl. Atty. Decl., Ex. 23 (Bradley expert report).  AMR took Officer Acquino, by contrast, to ECMC, a trip that took nine minutes (AMR Atty. Affirm., Ex. K).

AMR's expert, Dr. Dietrich Jehle, reaches the opposite conclusion (AMR Atty. Affirm., Ex. W ("Jehle Aff." and "Jehle Report").  Dr. Jehle reviewed the evidence on the timeliness of AMR's response and the decision to transport Hernandez-Rossy to Kenmore Mercy.

As to timeliness, Dr. Jehle opines that the 7-minute response time was proper and appropriate under industry standards (Jehle Aff. ¶¶ 4, 6; Jehle Report, p. 7).  Dr. Jehle notes that the response time was shorter than the median response time for trauma cases in Western New York and shorter than the 15-minute response time referenced in Bradley's report (Jehle Report, p. 7).  Dr. Jehle further maintains that the medical interventions performed by AMR personnel on the scene were necessary and appropriate, and that a faster "scoop and go" removal would not have been proper due to Hernandez-Rossy's unstable condition (id., Jehle Aff., ¶ 5).

As to the decision to go to Kenmore Mercy, Dr. Jehle opines that transporting Hernandez-Rossy there, despite it not being a Level I trauma center, was proper and appropriate because Kenmore Mercy was closer and was fully equipped and qualified to treat Hernandez-Rossy (Jehle Aff., ¶¶ 14-16; Jehle Report, p. 9).  Dr. Jehle also opines that "by the time [Hernandez-Rossy] was found by the police officers there was virtually no chance that [he] would survive the injury" (Jehle Aff. ¶ 19).

## III.   DISCUSSION

### A. Applicable Standards

#### 1. Summary Judgment

Summary judgment is appropriate if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law," Fed. R. Civ. P. 56 (a).  A fact is "material" if it "might affect the outcome of the suit under the governing law," Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986).  An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," id.

The movant seeking summary judgment has the burden (through pleadings, depositions, answers to interrogatories, admissions, affidavits, and other materials, Fed. R. Civ. P. 56 (c)(1)), to demonstrate the absence of a genuine issue of material fact, Ford v. Reynolds, 316 F.3d 351, 354 (2d Cir. 2003).

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion," Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct. 1598, 26 L. Ed. 2d 142 (1970).  "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper," Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991).  The function of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue of fact for trial," Anderson, supra, 477 U.S. at 249.  "Assessment of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment," Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment, Anderson, supra, 477 U.S. at 252.  A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts; it must "offer some hard evidence showing that its version of the events is not wholly fanciful," Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986).  That is, there must be evidence from which the jury could reasonably find for the nonmoving party, Anderson, supra, 477 U.S. at 252.

This district's Local Civil Rules require that the moving party submit "a separate, short, and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried," W.D.N.Y. Loc. Civ. R. 56 (a)(1), and the opponent to submit a response to each numbered paragraph in the movant's statement, id. R. 56 (a)(2).  Each numbered paragraph in the movant's statement will be deemed admitted unless specifically controverted by a correspondingly numbered paragraph in the opponent's statement, id.

## 2. Admissibility of Expert Opinion

Summary judgment is supported only upon admissible evidence, see Fed. R. Civ. P. 56 (c)(1)(B); Nora Beverages, Inc. v. Perrier Grp. of Am., Inc., 164 F.3d 736, 746 (2d Cir. 1998).  At this stage, this Court can "'decide questions regarding the admissibility of evidence, including expert opinion evidence,'" Foley v. United States, 294 F. Supp. 3d 83, 91 (W.D.N.Y. 2018) (quoting Bah v. Nordson Corp., No. 00-cv-9060, 2005 WL 1813023, at *6 (S.D.N.Y. Aug. 1, 2005)).  Plaintiff, as proponent of her expert's opinion, has the burden of establishing its admissibility by a preponderance of evidence, id. (quoting United States v. Williams, 506 F.3d 151, 160 (2d Cir. 2007)).

10

Under Federal Rule of Evidence 702, a witness may testify as an expert once he or she is qualified by "knowledge, skill, experience, training, or education" if "the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue," the testimony is based on sufficient facts or data, the testimony is the product of reliable principles and methods, and the expert reliably applied the principles and methods to the facts of the case, Fed. R. Evid. 702 (a)-(d).  In performing its gatekeeping role, this Court "must ensure that a witness is qualified as an expert," Foley, supra, 294 F. Supp. 3d at 91, and that the opinion "'both rests on a reliable foundation and is relevant to the task at hand,'" id. (quoting Daubert v. Merrell Dow Pharm., Inc., 509 U.S. 579, 597, 113 S. Ct. 2786, 125 L. Ed. 2d 469 (1993)).  This Court has "broad discretion in the matter of the admission or exclusion of expert evidence," Salem v. U.S. Lines Co., 370 U.S. 31, 35, 82 S. Ct. 1119, 8 L. Ed. 2d 313 (1962); Foley, supra, 294 F. Supp. 3d at 91 (at summary judgment, the court can decide on questions of admissibility of evidence including expert opinion) (quoting Salem, supra, 370 U.S. at 35).

### 3. Negligence, Medical Malpractice, and Wrongful Death Standards

#### a. Wrongful Death Elements

Under New York law, the elements of a wrongful death action are a death of a human being; caused by the wrongful act, negligence, or default of the defendant; giving rise to a cause of action that could have been maintained, at the moment of death, by decedent if death had not ensued; survival by distributees who have suffered pecuniary loss by reason of the death; and appointment of a personal representative of decedent

(here, Plaintiff), N.Y. Est. Powers & Trusts Law § 5-4.1; e.g., Prink v. Rockefeller Ctr., Inc., 48 N.Y.2d 309, 315, 422 N.Y.S.2d 911, 915 (1979).

### b. Distinction Between Medical Malpractice and Negligence

Rendering ambulance services constitutes health care falling within the scope of medical malpractice, see Pellegrini v. Richmond Cnty. Ambulance Serv., Inc., 48 A.D.3d 436, 851 N.Y.S.2d 268 (2d Dep't 2008) (medical malpractice against ambulance service provider); Sigmon v. Tompkins Cnty., 113 Misc. 2d 655, 656-57, 449 N.Y.S.2d 621, 622-23 (Sup. Ct. Tompkins Cnty. 1982) (medical malpractice panels include ambulance provider as entity that furnishes "health care services"); see also Brown v. Cnty. of Jefferson, No. 9:20-CV-1192 (GLS/ATB), 2021 WL 2941919, at *4 (N.D.N.Y. June 11, 2021) (applying accepted medical practice to ambulance paramedics).

Medical malpractice is a species of negligence. In one case, the New York Court of Appeals held that there is a subtle distinction between medical malpractice and negligence, with "no rigid analytical line separat[ing] the two," Scott v. Uljanov, 74 N.Y.2d 673, 674, 543 N.Y.S.2d 369, 370 (1989); Weiner v. Lenox Hill Hosp., 88 N.Y.2d 784, 787, 650 N.Y.S.2d 629, 631 (1996). This distinction "turns on whether the acts or omissions complained of involve a matter of medical science or art requiring special skills not ordinarily possessed by lay persons or whether the conduct complained of can instead be assessed on the basis of the common everyday experience of the trier of the facts," Halas v. Parkway Hosp., Inc., 158 A.D.2d 516, 516-17, 551 N.Y.S.2d 279, 279 (1st Dep't 1990) (citations omitted); see Friedmann v. N.Y. Hosp.-Cornell Med. Ctr., 65 A.D.3d 850, 850-51, 884 N.Y.S.2d 733, 734 (1st Dep't 2009). While there is no rigid analytical line, "conduct may be deemed malpractice, rather than negligence, when it 'constitutes

12

medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician,'" <u>Scott</u>, <u>supra</u>, 74 N.Y.2d at 674, 675, 543 N.Y.S.2d at 370 (hospital's assessment of intoxicated patient during emergency room care was held integral part of rendering medical treatment to that patient) (quoting <u>Bleiler v. Bodnar</u>, 65 N.Y.2d 65, 72, 489 N.Y.S.2d 885, 889 (1985)).  When "'the gravamen of the complaint is not negligence in furnishing medical treatment to a patient, but the hospital's failure in fulfilling a different duty,' the claim sounds in negligence," <u>Weiner</u>, <u>supra</u>, 88 N.Y.2d at 788, 650 N.Y.S.2d at 631 (holding that hospital negligently collected blood (not malpractice)) (quoting <u>Bleiler</u>, <u>supra</u>, 65 N.Y.2d at 73, 489 N.Y.S.2d at 891).  New York law also has different statutes of limitations for these distinct torts,[4] <u>Scott</u>, <u>supra</u>, 74 N.Y.2d at 674, 543 N.Y.S.2d at 370.

The chief distinction between these torts applicable here is the requisite proof to establish liability.  Simple negligence against a medical provider applies where the negligent act may be readily determined by a trier of fact based on common knowledge, without requiring expert medical-opinion evidence, <u>Friedmann</u>, <u>supra</u>, 65 A.D.3d at 850-51, 884 N.Y.S.2d at 734; <u>McQueen v. United States</u>, No. 9:19-CV-998 (TJM/CFH), 2021 WL 3849457, at *10 (N.D.N.Y. June 29, 2021) (Report & Recommendation), <u>adopted by</u>, 2021 WL 3848494 (N.D.N.Y. Aug. 27, 2021); <u>Reardon v. Presbyterian Hosp. in City of N.Y.</u>, 292 A.D.2d 235, 237, 739 N.Y.S.2d 65, 67 (1st Dep't 2002).  On the other hand, medical malpractice requires expert medical-opinion evidence, "'except as to matters within the ordinary experience and knowledge of laymen,'" <u>Milano by Milano v. Freed</u>,

---

[4]Medical, dental, or podiatric malpractice has 2-year and 6-month limitations periods, N.Y. CPLR 214-a, while other negligence, including malpractice other than medical, dental, or podiatric, has a 3-year limitations period, N.Y. CPLR 214.

64 F.3d 91, 95 (2d Cir. 1995) (quoting <u>Fiore v. Galang</u>, 64 N.Y.2d 999, 1001, 489 N.Y.S.2d 47, 48 (1985)).

In <u>McQueen</u>, for example, the magistrate judge recommended granting the defendant summary judgment after construing McQueen's injury from delayed eye surgery as a medical-malpractice claim, applying the community standards for when medical treatment should have been provided, <u>McQueen</u>, <u>supra</u>, 2021 WL 3849457, at *11.  Considered as a medical-malpractice claim, the court found that McQueen failed to proffer the necessary expert medical-opinion evidence (or point to defendant's evidence) that the nurse practitioner breached a standard of care in the community, <u>id.</u>, citing <u>Watts v. U.S. Fed. Bureau of Prisons</u>, No. 07-CV-773 (DNH), 2009 WL 81285, at *9 (N.D.N.Y. Jan. 9, 2009); <u>Milano</u>, <u>supra</u>, 64 F.3d at 95.  Consequently, the court found that McQueen had not produced sufficient evidence to prove medical malpractice, <u>see</u> <u>McQueen</u>, <u>supra</u>, 2021 WL 3848494, at *1.

### 4. Supplemental Jurisdiction

Plaintiff's claim against AMR arises under New York law.  This Court thus has subject-matter jurisdiction only if it exercises supplemental jurisdiction.  The parties, however, have not expressly addressed whether this Court should do so.

Subject-matter jurisdiction over state-law claims may be raised by the parties or by the court *sua sponte*, <u>Lyndonville Sav. Bank & Tr. v. Lussier</u>, 211 F.3d 697, 700-01 (2d Cir. 2000).  This Court must examine its jurisdiction at any point in the proceeding, <u>Carnegie-Mellon Univ. v. Cohill</u>, 484 U.S. 343, 351, 108 S. Ct. 614, 98 L. Ed. 2d 720 (1988) (the district court has "to consider throughout the litigation whether to exercise its jurisdiction over the case").

Under 28 U.S.C. § 1367, this Court may exercise supplemental jurisdiction over Plaintiff's state-law claims, see Klein v. London Star Ltd., 26 F. Supp. 2d 689, 692 (S.D.N.Y. 1998), or may decline to hear them, 13D Charles A. Wright, Arthur R. Miller, Edward H. Cooper, and Richard D. Freer, Federal Practice and Procedure, § 3567.3, at 397 (Jurisd. Rev. 3rd ed. 2008).   This Court "may decline to exercise supplemental jurisdiction over a claim" if all original jurisdiction claims were dismissed, 28 U.S.C. § 1367 (c)(3); see 13D Federal Practice and Procedure, supra, § 3567.3, at 400, 428-29. Alternatively, this Court has the discretion to exercise supplemental jurisdiction even after dismissal of original federal jurisdiction claims, 13D Federal Practice and Procedure, supra, § 3567.3, at 432.

Given the existence of original-jurisdiction claims against the other defendants, as discussed in the separate decision filed contemporaneously herewith (Docket No. 142), this Court will exercise supplemental jurisdiction over the state-law claim against AMR, just as it did over the state-law claims against the other defendants.   The state claims arise from the same nucleus of facts as the remaining federal claims, see Bailey v. City of Chi., No. 89 C 1021, 1990 WL 104048, at *2 (N.D. Ill. June 29, 1990) (finding a common nucleus of operative facts from a police-involved shooting and the arrest and medical treatment after the shooting).   Proper jurisdiction is therefore present.

## B.  Parties' Contentions

The arguments in the parties' motions overlap.   Plaintiff's principal argument rests upon her experts' opinions that AMR was slow in arriving and treating Hernandez-Rossy and later transported him to an inappropriate hospital.   Based on one expert's opinion,

Plaintiff contends that AMR's response time breached professional standards for emergency ambulatory care.

AMR retorts with its own expert that its response time to Hernandez-Rossy was reasonable and transporting him to Kenmore Mercy was appropriate, with its response time and transport decision meeting industry standards.

### 1. AMR's Motion

#### a. AMR's Arguments

AMR characterizes Plaintiff's claim as a medical-malpractice claim, which would require Plaintiff to establish that AMR breached the applicable standard of care and that this breach proximately caused Hernandez-Rossy's injuries, Foley, supra, 294 F. Supp. 3d at 91.  As a medical-malpractice claim, Plaintiff would need to submit admissible testimony from a qualified expert to establish the violation of the standard of care, see Milano, supra, 64 F.3d at 95.  AMR argues that Plaintiff has failed to do so.

AMR contends that it is entitled to summary judgment because its response time of up to 15 minutes met industry standards for appropriate emergency ambulatory care. It further notes that, absent her challengeable expert, Plaintiff has not proffered admissible expert evidence regarding the appropriateness of the response time.

As to AMR transporting Hernandez-Rossy to Kenmore Mercy rather than to ECMC, Plaintiff's expert (Bradley) opines that Hernandez-Rossy should have been transported sooner and to ECMC, not Kenmore Mercy (Pl. Atty. Decl., Ex. 23).  AMR argues, however, that Bradley did not opine as to the appropriateness of Kenmore Mercy as a trauma center or an emergency room.  AMR challenges Bradley's qualifications to opine on Kenmore Mercy's status as a trauma center or an appropriate emergency facility

on the basis that Bradley is not a doctor.  Further, AMR argues that Bradley does not causally link the absence of trauma facilities to Hernandez-Rossy's death.  AMR further contends that the travel time from Tonawanda Street to either Kenmore Mercy or ECMC was the same.  AMR argues that Bradley's opinion fails to raise a material issue of fact.

In support of its motion, AMR presents the affidavit and report of its expert, Dr. Dietrich Jehle (AMR Atty. Affirm., Ex. W).  Dr. Jehle was the emergency department director at ECMC for 17 years.  He was a member of the Western Regional Emergency Medical Advisory Committee (or "WREMAC") and was involved in drafting the WREMAC guidelines for ambulatory care, which Plaintiff's expert cites (id. ¶ 1; Jehle Report, p. 6; AMR Atty. Affirm., Ex. D, Bradley Report, p. 6).  Dr. Jehle opines on the response time and AMR's transport of Hernandez-Rossy to the appropriate hospital.

Using AMR's PCR for his chronology, Dr. Jehle concludes that AMR's response time of over seven minutes was within the median response time for trauma patients in this region (Jehle Report, p. 7).  Alternatively, Dr. Jehle concludes that even if the response time was 15 minutes, as Plaintiff claims, it would still comply with applicable standards of care given the circumstances of this case (id.).

Dr. Jehle further concludes that the care and treatment rendered to Hernandez-Rossy complied with applicable standards of care (Jehle Aff., ¶¶ 2, 3, 8-12; Jehle Report, p. 7).  Dr. Jehle also opines that the decision to transport Hernandez-Rossy to Kenmore Mercy was appropriate because of that hospital's proximity to the Tonawanda Street scene and ability to provide the necessary emergency care (Jehle Aff. ¶¶ 13-14; Jehle Report, pp. 9-10).

### b.  Plaintiff's Opposition

Plaintiff responds that her claim is one of only simple negligence, not medical malpractice, hence not requiring expert medical-opinion evidence to support her claim.

Nevertheless, Plaintiff submits Bradley as her expert witness along with two pathologists who examined Hernandez-Rossy post-mortem.  Plaintiff states that Bradley is the former zone vice president of the predecessor to AMR, overseeing its ambulance operations.  Plaintiff represents that Bradley considered the surveillance video of the incident, witness testimony, and other evidence as factual support for his opinion on the response time.

Plaintiff disputes the validity of AMR's log PCR time entries because they were based upon what she contends were paramedic Bosley's after-the-fact, inherently unreliable log entries.  Plaintiff, instead, relies on the surveillance video time entries to establish when AMR arrived and began treating Hernandez-Rossy.  From the 911 call log reporting Hernandez-Rossy's arrest and need for emergency care at 5:16 p.m. and a neighbor's video recording time stamp, Plaintiff contends that the ambulance arrived at 5:32 p.m. (Pl. Statement, ¶¶ 5, 18; Pl. Atty. Decl., Exs. 3, 16, 17).  Plaintiff concludes that this 15-minute response time violated professional standards (Pl. Atty. Decl., Ex. 23).

Plaintiff objects to Dr. Jehle's reliance on AMR's PCR (and finding a briefer response time) because the time log in that report does not reconcile with time entries from surveillance videos of the scene.

### 2.  Plaintiff's Motion

Plaintiff moves for summary judgment in her own favor on the basis that AMR failed its duty to respond with due care and timeliness.  She argues that the timeline of the

incident shows that AMR was negligent in its response and thereby delayed critical care to Hernandez-Rossy.  Plaintiff claims that AMR received notification of the shooting at 5:13 p.m., but did not transport Hernandez-Rossy to a hospital until 5:46 p.m., arriving at Kenmore Mercy at 5:50 p.m.  Plaintiff asserts that this delay constituted negligence.  See Butler v. N.Y. State Olympic Reg'l Dev. Auth., 292 A.D.2d 748, 738 N.Y.S.2d 774 (3d Dep't 2002).

AMR argues that Plaintiff mistakenly relies on Bradley's expert opinion that a 15-minute response time was excessive and violated industry standards.  AMR contends that the actual response time was within acceptable limits, based on Dr. Jehle's expert opinion.  AMR further argues that Plaintiff's causation experts—pathologists Drs. Gerard Catanese and Katherine Maloney—create material issues of fact as to causation.

Plaintiff replies that her claim is not medical malpractice but remains negligence cognizable by a layperson.  Alternatively, she relies on Dr. Catanese's opinion that Hernandez-Rossy would have survived had AMR arrived sooner.  Plaintiff defends Bradley's opinion given his expertise in operations, logistics, transport protocols, and contract compliance of an ambulance service.  Plaintiff continues to dispute AMR's chronology for its response time and the duration of its treatment of Hernandez-Rossy.

### C. Plaintiff Alleges Medical Malpractice Not Simple Negligence

This Court must determine whether Plaintiff alleges negligence or medical malpractice to identify the appropriate standard of proof for her Fifth Cause of Action.  As the New York State Court of Appeals elsewhere observed, "except as to matters within the ordinary experience and knowledge of laymen, in a medical malpractice action, expert medical opinion evidence is required to demonstrate merit," Fiore, supra, 64 N.Y.2d at 1001, 489 N.Y.S.2d at 48; see Milano, supra, 64 F.3d at 95.  Thus, if Plaintiff's Fifth Cause

19

of Action is deemed to allege medical malpractice, Plaintiff would need to produce admissible medical-opinion evidence to support her claim.

Plaintiff here alleges that AMR and the other defendants were negligent, careless, and reckless in administering first aid and treatment (or failure to render same) to Hernandez-Rossy following the shooting (Compl. ¶¶ 40, 41). As alleged against AMR, the Fifth Cause of Action focuses on how medical treatment was (or should have been) rendered to Hernandez-Rossy. Deficiencies in provision of ambulatory services and first aid care implicates medical malpractice requiring specialized knowledge beyond the ordinary experience and ken of laypeople, Milano, supra, 64 F.3d at 95; Fiore, supra, 64 N.Y.2d at 1001, 489 N.Y.S.2d at 4; Butler, supra, 292 A.D.2d at 751, 738 N.Y.S.2d at 776 (plaintiff's ski patrol expert testified as to standard of care following injury on slopes); Brown, supra, 2021 WL 2941919, at *4. Decisions concerning what type of care to administer and when to administer it are the subject of malpractice, McQueen, supra, 2021 WL 3849457, at *11. Where "the directions given or treatment received by the patient is in issue, consideration of the professional skill and judgment of the practitioner or facility is required and the theory of medical malpractice applies," Friedmann, supra, 65 A.D.3d at 851, 884 N.Y.S.2d at 734. Rendering first aid and transporting a patient to a medical facility (and rendering care in transit) are examples of provision of medical care, see Sigmon, supra, 113 Misc. 2d at 657, 449 N.Y.S.2d at 623 (ambulance staff's care and treatment during transfer between hospitals alleged medical malpractice).

Whether a shooting victim like Hernandez-Rossy should receive first aid and medical care or transport to an emergency medical facility are matters of common knowledge, and the wholesale failure to furnish such care or deficiencies in rendering that

care would be negligence.  Proof of such claims may not require medical or professional expert opinion.  Also obvious is the need to render care if someone is bleeding to death, as Plaintiff characterizes Hernandez-Rossy's situation.  Common sense further dictates that first aid should be administered to a shooting victim as soon as possible.

But administering emergency ambulatory care to a shooting victim poses numerous other concerns: the type, duration, and manner of first aid that should be administered; the appropriate response time of an ambulance to a shooting victim; whether the shooting victim is beyond medical intervention at any point during the treatment; the time to stabilize the victim for further treatment or transport for that treatment; and the appropriate medical facility for transport.  Each of these issues is beyond common lay knowledge.  Sophisticated knowledge of required ambulatory care for the evolving circumstances is beyond the ken of laypeople.  The breach of duty under these circumstances is therefore a question of medical malpractice, e.g., McQueen, supra, 2021 WL 3849457, at *11 (citing cases), adopted, supra, 2021 WL 3848494.

These circumstances do not require an assessment of the common sense and judgment of the health care professionals and first responders treating Hernandez-Rossy. This differs from Reardon v. Presbyterian Hosp., supra, 292 A.D.2d at 237, 739 N.Y.S.2d at 67, where decedent Susan Reardon fell from an examining table during treatment at defendant's hospital as one of defendant's doctors tried to help her down, 292 A.D.2d at 236, 739 N.Y.S.2d at 66.  The Appellate Division held there that the amount of assistance given to Ms. Reardon in her dismount was simple negligence on the part of the hospital's doctor "not based upon an assertion that an improper assessment for her medical condition played any role in determining how to help her off the table," id. at 237, 739

N.Y.S.2d at 66.  Essentially, plaintiff's allegations there arose from the "'failure to exercise ordinary and reasonable care to insure that no unnecessary harm befell the patient,'" id. at 237, 739 N.Y.S.2d at 67 (quoting Halas v. Parkway Hosp., Inc., 158 A.D.2d 516, 517, 551 N.Y.S.2d 279, 280 (2d Dep't 1990)).  Similarly, where the complaint did not allege the diagnosis, treatment, or the failure to follow medical instructions, a fall from hospital bed without bed rails was not medical malpractice, Halas, supra, 158 A.D.2d at 517, 551 N.Y.S.2d at 280.

Decisions concerning when to dispatch an ambulance through those concerning hospital transport each involve aspects of the diagnosis and treatment of the emergency patient.  Therefore, as a medical-malpractice claim, Plaintiff must provide evidence beyond what is commonly understood by laypersons to establish the applicable professional standard for ambulatory care.  Plaintiff therefore needs to produce expert medical opinions to establish the standard of care and AMR's breach of that standard in affording care and transporting Hernandez-Rossy to the appropriate emergency facility, Milano, supra, 64 F.3d at 95; Fiore, supra, 64 N.Y.2d at 101, 489 N.Y.S.2d at 48.

### D.  AMR's Response Time

Plaintiff submits three expert opinions.  She primarily relies on Bradley's opinion for the timeliness of AMR's response to Hernandez-Rossy and whether Kenmore Mercy was the appropriate facility for Hernandez-Rossy's emergency treatment.  She also produces autopsy reports from Drs. Maloney and Catanese, the medical examiners who examined Hernandez-Rossy post-mortem (Pl. Atty. Decl., Ex. 24 (Dr. Maloney); Pl. Atty. Decl. Exs., 25, 26 (Dr. Catanese)).  These doctors opine as to the cause of death, and

22

Dr. Catanese further opines that had AMR arrived while Hernandez-Rossy was conscious, he may have survived (Pl. Atty. Decl., Ex. 26).

### 1.  Adin Bradley's Opinion is Inadmissible

This Court must first fulfill its gatekeeping function and determine whether Plaintiff's experts' opinions are admissible.  Bradley's is not.

Bradley's opinion is inadmissible because he lacks relevant specialized knowledge, cf. Fed. R. Evid. 702 (a).  Although Plaintiff argues that Bradley's expertise is in logistics, operations, and transport protocols for an ambulance company, she has not demonstrated that Bradley has relevant credentials, experience, or expertise to opine on appropriate ambulatory care.

First, Bradley's education is in human resources management, and he holds a Master of Business Administration (AMR Atty. Affirm., Ex. D, Bradley Report, pp. 4, 11, 13).  He is not certified in New York as a paramedic or EMT personnel, which would be relevant experience for opining on the proper ambulance response time that satisfies professional standards (AMR Atty. Affirm., ¶ 8, Ex. A).  Bradley's education does not reflect knowledge of the professional standards for emergency services.

Second, Bradley's work experience fails to reflect expertise in emergency or ambulatory treatment.  His experience is in business management for an ambulance company, not in provision of emergency medical services.  Currently an executive consultant, Bradley worked at the predecessor of AMR for seven years as the director of human resources, market general manager, division general manager, and zone vice president overseeing ambulance operations in multiple states (AMR Atty. Affirm., Ex. D, Bradley Report, p. 1).

Bradley claims extensive experience and expertise in ambulance dispatch, logistics, and contract compliance, having previously managed City of Buffalo ambulance operations for Rural/Metro (Docket No. 133, Bradley Aff. ¶¶ 4, 5).  Yet none of Bradley's previous positions involved specialized knowledge of ambulatory treatment practices. Bradley himself highlights his managerial experience on his resume—managing staff, negotiating service contracts with municipalities, hospital systems, and fire districts—not his ambulatory or medical experience, if any (AMR Atty. Affirm., Ex. D, Bradley Report, pp. 11, 13).

Ambulatory care experience is necessary to opine on the appropriate response time for emergency treatment of a shooting victim.  Bradley's experience and expertise involving ambulance operations and the dispatch functions of an ambulance service, however, do not reflect knowledge of professional standards that apply once an ambulance is dispatched, such that he is qualified to render an opinion on appropriate response times.  Consequently, this Court precludes Bradley's opinion as to appropriate response times consistent with its gatekeeping function, see Daubert, supra, 509 U.S. at 597.

### 2.  Plaintiff's Other Experts on AMR's Response Time

AMR does not challenge Plaintiff's other experts' qualifications.  Only their opinions are at issue.

Plaintiff relies on the autopsy conducted by Deputy Chief Medical Examiner Dr. Katherine Maloney (Pl. Atty. Decl., Ex. 24).  But Dr. Maloney merely opined on Hernandez-Rossy's cause of death—a gunshot wound of the left upper extremity and exsanguination— without stating an opinion as to the timeliness of first aid or emergency care rendered following the shooting (Pl. Atty. Decl., Ex. 24, at pp. 1, 2, 3, 7).  Dr. Maloney

simply finds that Hernandez-Rossy was pronounced dead in the emergency room after being shot (see id. at 7; Pl. Atty. Decl., Ex. 25).  Dr. Maloney does not address any events between the shooting and Hernandez-Rossy's death or opine on the efficacy of care rendered before he reached the emergency room.  Her opinions therefore do not support Plaintiff's position concerning the timeliness of AMR's care.

The only remaining opinion is that of Dr. Gerard Catanese (Pl. Atty. Decl., Exs. 25, 26).  Dr. Catanese concludes that had "paramedics arrived with advance life support when the patient was still alert and conscious and speaking with police officers," and had the patient received "appropriate medical care with advance life support sooner his likely hood [sic] of survival would have been greatly increased" (Pl. Atty. Decl., Ex. 26).  This opinion is not tied to a specific response time or standards of timely care based on response time, but contends that a different result may have obtained had AMR personnel arrived while Hernandez-Rossy was conscious.  AMR counters that there is no evidence that it could have arrived while Hernandez-Rossy was conscious because he lost consciousness soon after the Buffalo Fire Department arrived to administer first aid.

Having considered the record evidence, this Court finds that Plaintiff raises disputed issues of material fact concerning AMR's response time and when Hernandez-Rossy lost consciousness relative to AMR's arrival.  As discussed, the parties submit competing chronologies and dispute the appropriate sources for those chronologies.  They thus advocate different response times: the 15 minutes Plaintiff claims elapsed versus the over 7 minutes AMR urges.

The difference begins at the appropriate dispatch of AMR's ambulances.  As for AMR's start time, Plaintiff focuses on 911 calls starting at 5:13 pm as the relevant starting

event.   Those calls referred to the shooting of Officer Acquino at Garfield Street and Hartman Place (Pl. Atty. Decl., Ex. 3).  AMR, however, points to a later 911 dispatch for Hernandez-Rossy.  Tonawanda Street resident Carly Collier called 911 at 5:16 p.m. to report that Hernandez-Rossy was bleeding in a neighbor's yard (AMR Statement, ¶¶ 20-21; AMR Response, ¶ 3; Pl. Statement, ¶ 5; Pl. Atty. Decl., Ex. 3).  Hernandez-Rossy was apprehended (with a dispatched ambulance en route) at Tonawanda Street at 5:17 p.m. (AMR Atty. Affirm., Ex. G, pp. 2, 9; see AMR Statement, ¶ 22).  Once apprehended, Hernandez-Rossy's condition worsened as he received first aid care from the Buffalo Police and Fire Departments before AMR's ambulance arrived.

Another temporal dispute is AMR's ambulance arrival time at Tonawanda Street. According to AMR's internal log in the PCR, the ambulance arrived at 5:25 p.m., about 7 minutes after dispatch at 5:18 p.m. (see AMR Atty. Affirm., Ex. I, p. 1; AMR Response, ¶ 18).  But Plaintiff interprets the surveillance video time entries as showing that AMR arrived at 5:32 p.m. (Pl. Statement, ¶ 18; Pl. Atty. Decl., Exs. 16, 17; Pl. Statement, ¶ 29; Pl. Atty. Decl., Ex. 85).

Plaintiff also challenges the reliability of AMR's internal PCR on the basis that paramedic Bosley did not complete it on the scene in real time.  Bosley testified that he ordinarily completes PCRs either during transport of a patient or once a patient is delivered to the hospital (Pl. Atty. Decl., Ex. 34, pp. 14-15).  He stated that AMR policy requires him to complete the PCR as soon as possible after patient contact, and he did so with Hernandez-Rossy (id. at 16-17).

The parties present obviously conflicting chronologies.  If one accepts the 5:32 p.m. arrival time, Plaintiff's claimed response time is 15 minutes, as opposed to 19

minutes if the start time is the initial 911 call at 5:13 p.m.  These issues of fact are material in determining whether AMR complied with professional standards.  While Plaintiff has not produced admissible expert testimony disputing the standard for the actual response time, she offers another expert opinion concerning a global standard of care that renders the timeliness of AMR's care material.  That is, according to Dr. Catanese's autopsy conclusions, Hernandez-Rossy may have survived had AMR's ambulance arrived sooner, while Hernandez-Rossy was conscious.  The timing of Hernandez-Rossy losing consciousness relative to AMR's arrival is therefore material.

Plaintiff contends that police officers, firefighters, and neighbors observed Hernandez-Rossy conscious (Pl. Statement, ¶¶ 10, 12, 13), citing the testimony of Officer Richard Hy, who arrived at 5:24 p.m., that Hernandez-Rossy was talking and conscious when firefighters arrived at 5:28 pm (id. ¶¶ 11-13; Pl. Atty. Decl., ¶¶ 15-16).  According to Plaintiff, Hernandez-Rossy later lost consciousness about one minute after the firefighters arrived (Pl. Statement, ¶ 14; see also AMR Statement, ¶¶ 10, 12-14).

AMR, on the other hand, produced a statement from Tonawanda Street resident Carly Collier that Hernandez-Rossy "may have passed out" before the police arrived (AMR Response, ¶¶ 10, 12, 13; Pl. Atty. Decl., Ex. 29).  And AMR's ambulance crew maintains that Hernandez-Rossy was already unconscious and unresponsive when they arrived (AMR Atty. Affirm. Ex. I, p. 1).

The parties thus disagree as to when Hernandez-Rossy lost consciousness relative to the arrival of the ambulance.  If one accepts Dr. Catanese's opinion, this factual disagreement is material regardless of the precise dispatch chronology and the ambulance's arrival on the scene.  AMR concedes that Dr. Catanese's opinion raises an

issue of disputed fact as to causation (see Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment ("AMR Memo."), Docket No. 115, pp. 15-16). There are also issues of fact concerning when Hernandez-Rossy lost consciousness and whether AMR's ambulance could have arrived sooner and possibly saved him. These issues preclude summary judgment to either party on the question of AMR's response time. The parties' motions for summary judgment on the Fifth Cause of Action as it relates to appropriate response time will therefore be denied.

This Court next considers AMR's decision to take Hernandez-Rossy to Kenmore Mercy.

### E. Plaintiff Fails to Raise a Disputed Issue of Material Fact as to the Appropriateness of Kenmore Mercy Hospital as an Emergency Facility

AMR contends that it acted within the applicable standard of care when it elected to transport Hernandez-Rossy to Kenmore Mercy, rather than to ECMC. AMR maintains that it transported Hernandez-Rossy to Kenmore Mercy because he was in cardiac arrest and because it was a closer medical facility than ECMC (see AMR Statement, ¶¶ 54, 55). According to AMR, Hernandez-Rossy was unstable and had lost consciousness before its ambulance arrived (Pl. Statement, ¶ 14; Pl. Atty. Decl., Ex. 33, p. 26), and the ambulance crew administered CPR without Hernandez-Rossy regaining consciousness (AMR Statement, ¶¶ 49, 50, 52). AMR personnel therefore determined that Hernandez-Rossy was in cardiac arrest requiring transport to the nearest emergency department (id. ¶ 55).

Plaintiff maintains that AMR was negligent in failing to take Hernandez-Rossy to the nearest Level I trauma center (ECMC) because he had gunshot wounds. Plaintiff rests her contention on only Bradley's opinion, who himself cites the WREMAC trauma

protocol[5] providing that trauma arrest patients and patients with an unstable airway should be transported to the nearest emergency department and unstable patients to a hospital within ten minutes of disentanglement, while all other major trauma should be transferred to an appropriate trauma center (AMR Atty. Affirm., Ex. D, p. 6).   But as previously explained, Bradley's opinion is precluded as not meeting the threshold requirements for expert-opinion evidence, see Daubert, supra, 509 U.S. at 597; Foley, supra, 294 F. Supp. 3d at 91.

Plaintiff also relies on Dr. Catanese's autopsy report as an expert opinion for the appropriate trauma center (Pl. Atty. Decl., Ex. 26; Atty. Decl., Exs. 25, 26).   As noted above, however, this opinion—that Hernandez-Rossy may have realized a different outcome had he been treated sooner— addresses only the timeliness of AMR's arrival, not the appropriate hospital for Hernandez-Rossy's subsequent emergency care.   Dr. Catanese renders no opinion on Kenmore Mercy's capacity to furnish emergency care, Hernandez-Rossy's care there, or whether Hernandez-Rossy should have been taken to ECMC.   And Plaintiff's other medical examiner expert, Dr. Maloney, found only that Hernandez-Rossy was pronounced dead in the Kenmore Mercy emergency room (Pl. Atty. Decl. Ex. 24, p. 7).   Dr. Maloney did not opine on the adequacy of Kenmore Mercy's emergency facilities to care for Hernandez-Rossy.

Accordingly, the sole basis for Plaintiff's claim concerning AMR's decision to take Hernandez-Rossy to Kenmore Mercy is Bradley's opinion (cf. Pl. Statement, ¶¶ 54, 55). Since that opinion has been precluded due to Bradley's lack of relevant expertise and background to opine intelligently on the appropriate emergency facility, Plaintiff fails to

---

[5]Bradley, however, did not list the WREMAC policy among the reference materials he used in rendering his opinion (AMR Atty. Affirm., Ex. D, Bradley Report, p. 10).

offer admissible evidence from which a reasonable jury could find in her favor on this claim.

Meanwhile, AMR's expert was on WREMAC and helped draft the emergency-care guidelines (AMR Atty. Affirm., Ex. W, ¶ 1) on which Bradley and Rossy rely (see id., Ex. D, pp. 6-7).  The WREMAC guidelines recommend transporting a patient to the closest emergency facility when the patient is in cardiac arrest (AMR Atty. Affirm., Ex. W, ¶ 7) or has an unstable airway (AMR Statement, Ex. A, p. 6), or to an appropriate trauma center for major-trauma patients (see id.).  Dr. Jehle observes that Hernandez-Rossy was in cardiac arrest when AMR treated him (AMR Atty. Affirm., Ex. W, ¶¶ 8-9).  Hernandez-Rossy's wound was treated with a tourniquet by police officers before AMR arrived and, according to Dr. Jehle, hypovolemic (that is, diminished blood volume[6]) shock from the brachial artery injury was addressed by the tourniquet.  Plaintiff has not objected to these facts or provided contrary admissible evidence about Hernandez-Rossy's condition.

Furthermore, while conceding that Kenmore Mercy was not a Level I trauma center, Dr. Jehle noted that "the facilities at Kenmore Hospital were fully equipped and qualified to treat this patient's injuries," concluding that the decision to transport Hernandez-Rossy to Kenmore Mercy was proper and appropriate (id. ¶ 16).  As a physician and member of the WREMAC, Dr. Jehle is qualified to assess the emergency- and trauma-care capabilities of Kenmore Mercy and its appropriateness for Hernandez-Rossy's care.

Plaintiff fails to present admissible contrary evidence, and therefore fails to raise a disputed issue of material fact.  Plaintiff has not produced admissible evidence that the

---

[6]Merriam Webster's Medical Desk Dictionary, at 320 (1993).

appropriate facility to transport Hernandez-Rossy was ECMC, and not the nearest emergency room (Kenmore Mercy), nor has she offered proof of the distance from the Tonawanda Street site to either hospital.  This Court takes judicial notice under Federal Rule of Evidence 201, see Logan v. Matveevskii, 57 F. Supp. 3d 234, 266 n.10 (S.D.N.Y. 2014), that 568 Tonawanda Street is 3.3 miles from Kenmore Mercy by vehicle (see AMR Atty. Affirm., Ex. I), but 5.3 miles by vehicle from ECMC.  Absent admissible proof from Plaintiff contesting Kenmore Mercy as an appropriate treatment facility, she fails to raise an issue of material fact.  As such, AMR's motion for summary judgment on the transport claim in Plaintiff's Fifth Cause of Action is granted.

## IV.    CONCLUSION

For the reasons stated above, AMR's motion for summary judgment will be granted in part and denied in part, and Plaintiff's motion seeking the same relief will be denied. Only that portion of Plaintiff's Fifth Cause of Action asserting the response-time claim remains as against AMR.

## V.    ORDERS

IT HEREBY IS ORDERED, that AMR's Motion for Summary Judgment (Docket No. 98) is GRANTED IN PART and DENIED IN PART, consistent with this decision.

FURTHER, that Plaintiff's Motion for Summary Judgment (Docket No. 99) is DENIED.

FURTHER, that the parties must adhere to this Court's Orders concerning alternate dispute resolution, consent to magistrate judge jurisdiction, and the filing of a written status report set forth in the companion decision filed contemporaneously herewith (Docket No. 142).

31

SO ORDERED.


Dated:        September 5, 2023
              Buffalo, New York


                                                    s/William M. Skretny
                                                 WILLIAM M. SKRETNY
                                                United States District Judge